**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79417-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ABDOUL AZIZ JALLOW, | ) | |
| | ) | PUBLISHED OPINION |
| Appellant. | ) | |
| | ) | |

MANN, C.J. — Abdoul Jallow appeals his conviction of two counts of animal cruelty in the first degree. He contends that (1) the evidence was insufficient to convict him of animal cruelty, (2) the to-convict instruction omitted the element of causation, thus relieving the State of its burden of proof, and (3) because animal cruelty is an alternative means crime, violation of the unanimous jury verdict requires reversal of one of the animal cruelty convictions. We agree that the to-convict instruction was insufficient, and reverse.

FACTS

After receiving a report concerning the condition of sheep and goats on a property outside of Marysville on October 19, 2016, animal control officer Chad Davis

conducted a welfare check on the animals. On his first visit to the property, Davis observed several sheep and goats that had quality hay and water. Davis made two other undocumented stops where he observed hay from the road.

Davis's next documented visit was on November 14, 2016. Davis observed that there was no food or water available to the animals, although there were some remnants of hay visible. Davis saw a sheep lying on its side, appearing lifeless. Upon closer inspection, Davis confirmed the sheep was deceased. Davis saw another sheep lying inside the shed that would not get up and come to the fence with the other animals.

Davis tracked down the owner of the property using a license plate provided by a neighbor, which associated with a nearby residence. Davis went to the residence and spoke with Jallow's wife, explaining that one of the sheep needed immediate medical attention, and another sheep was deceased. She informed Davis that Jallow was out of the state. Davis left a voicemail for Jallow informing him of the condition of the animals. Davis did not seize the carcass or enter the property because he did not have a warrant.

On December 5, 2016, Davis responded to another report from Jallow's neighbor. The neighbor had taken a tan female sheep from the field and wrapped it in a blanket. The sheep appeared lifeless and could not hold up its head. Davis took the tan female sheep to a veterinarian immediately.

The veterinarian, Dr. Tim Cuchna, found that the sheep was breathing, but was nonresponsive to stimulation. Dr. Cuchna determined that the sheep was hypothermic, because its "body condition was very poor, resulting in it not being able to maintain its

body temperature . . . it was wet." He explained that not having enough food can result in the low temperature. On a scale of 1 to 5, where 1 is severely emaciated and 5 is an extremely obese animal, Dr. Cuchna rated the sheep as "a 1 at most." Dr. Cuchna opined that the tan female sheep had not been getting enough nutrition "over a fair amount of time." He also determined that the sheep was moderately dehydrated and suffering from parasites. Dr. Cuchna opined that the sheep's poor health was a result of both parasites and poor nutrition, and he performed a humane euthanasia on the sheep.

Davis left another voicemail for Jallow, explaining that he had one of the sheep at the vet, and that Jallow needed to contact him immediately. When Davis spoke to Jallow, he informed him that the sheep had been euthanized. Jallow told Davis that his cousin, Sheriff Jabang, would sell the other animals.

Davis returned to Jallow's field on December 6, 2016, and observed that the animals had no food or access to water, as the trough was iced over. He fed them with food he had brought from his personal barn and broke the ice. He examined a goat and a sheep, and determined that the goat was emaciated. Davis posted an orange 3x5 card instructing the owner to contact him immediately. Davis returned the next two days to provide food and water to the animals, as there was no food out for them and the water iced over again. He attempted to contact Jallow but was unsuccessful.

On December 9, 2016, Davis returned with a search warrant to seize the animals. He discovered that a small brown sheep that had been alive the previous day was now deceased.

Davis took the deceased small brown sheep, and seized a live goat and three live sheep. Davis took the animals to the veterinary hospital, where Dr. Travis McKinzie examined them. Dr. McKinzie determined that the goat was likely anemic, had an elevated heart rate, and was very thin. He determined that the first living sheep was a body condition 3, on a scale of 1 to 9, with 1 being severely emaciated and 9 being extremely obese. The second sheep was also a 3 out of 9 on the body condition scale, and its mucous membranes were slightly pale, which can indicate anemia. The third sheep was a 3 ½ to 4 on the body condition scale.

Dr. McKinzie examined the deceased small brown sheep and determined that it was between a 1 and 1-1/2 on the body condition scale. Dr. McKinzie observed that the sheep had no solid content in its stomach and that there was evidence of parasites in the liver. He determined that the sheep's case of death was malnutrition, resulting from a combination of disease causing the loss of nutrition, and the lack of adequate nutrition coming in. He opined that if an animal is receiving adequate nutrition, parasites are less likely to be an issue, or be fatal. Dr. McKinzie concluded that if the group of animals had limited access to feedstuff, the larger animals would take as much as they could, fighting off and excluding the smaller animals.

Jallow was charged with three counts of first degree cruelty to animals and one count of bail jumping.[1] The small brown sheep formed the basis for count 1, and the tan female sheep formed the basis for count 3.[2] At trial, Jallow testified that he owned the animals, he fed them every morning, and he never went two days without checking on

---

[1] The bail jumping charge was a result of Jallow's failure to appear when he was charged with first degree animal cruelty on March 3, 2017.
[2] The deceased sheep observed during the November 14, 2006, visit formed the basis for count 2, which the State later dismissed as the sheep was never examined by a medical professional.

the animals. Jallow said that he left on an extended trip to Arizona in October 2016, and arranged for Jabang to care for the animals.

Jallow said that after Davis originally contacted him in November, and his wife contacted him, he checked in with Jabang and confirmed that he was caring for the animals. Before leaving, Jallow had no concerns about leaving the animals in Jabang's care. He testified that "I was under the impression that they were in good hands until I found out that they were not."

Because Davis continued contacting him, Jallow testified that he attempted to sell the animals via Craigslist. He relied on Jabang to execute the sale and believed that Jabang sold the animals. When Jallow learned that no sale occurred, he then posted the animals on Craigslist for free. Jallow testified that he cut his trip short because of the animals. He returned from his trip the morning of December 8, 2016, but he did not visit the field until the evening of December 9, 2016.

Jabang testified that he gave the animals food and water but he was unsure how long Jallow was gone. He testified that Jallow called him to take care of the deceased sheep in November but that his truck broke down and he was unable to remove the deceased sheep. Jabang did not remember how many times he went to the field to care for the animals, but maintained that when the animals were under his care, they were always well fed and watered.

A jury convicted Jallow of first degree cruelty to animals on count 1 (small brown sheep) and count 3 (tan female sheep), and of bail jumping. Jallow appeals.

ANALYSIS

A. Sufficiency of the Evidence

Jallow first argues that the evidence was insufficient to convict him of animal cruelty because the State failed to prove that Jallow acted with negligence. We disagree.

A sufficiency of the evidence challenge admits the truth of the State's evidence and accepts the reasonable inferences from that evidence. State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Evidence is sufficient if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). Because credibility determinations are made by the trier of fact, we defer to the trial court on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

> The State charged Jallow with animal cruelty in the first degree:
>
> A person is guilty of animal cruelty in the first degree when . . . he or she, with criminal negligence, starves, dehydrates, or suffocates an animal, or exposes an animal to excessive heat or cold and as a result causes: (i) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (ii) death.

RCW 16.52.205(2).

A person acts with criminal negligence when they fail "to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk

constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

Jallow contends that he was not criminally negligent because he arranged to have Jabang care for the animals. However, his lack of communication with Jabang demonstrated direct criminal negligence. Although Jallow could have initially believed that Jabang was properly caring for the animals, once Davis and his wife notified him that one sheep was deceased, and another was in need of immediate medical attention, Jallow was on notice that Jabang was not properly caring for the animals. However, Jallow continued to rely on Jabang. Even after Jallow was notified by Davis that another one of his sheep was euthanized, Jallow continued to rely on Jabang to sell the animals, which Jabang failed to do. Posting an advertisement that the animals were free to take did not allow Jallow to escape fault. He did not follow up with Jabang, his wife, or Davis to ensure that the animals had actually been claimed, or were receiving food and water. A reasonable person in this situation would have found an alternative caretaker for the animals.

Jallow was also directly negligent when he failed to immediately attend to the animals upon his return home. While Jallow testified that he cut his trip short out of concern for his animals, his actions do not reflect this sentiment. Although Jallow returned home on December 8, 2016, he did not check on the animals until the next evening. By that point, the small brown sheep that had been alive on December 8, 2016, had died, and Davis had seized the remaining animals.

Jallow argues that because the animals were not in his exclusive care, he was not negligent. He relies on State v. Zawistowski, 119 Wn. App. 730, 737, 82 P.3d 698

(2004), State v. Peterson, 174 Wn. App. 828, 855, 301 P.3d 1060 (2013), and State v. St. Clare, 198 Wn. App. 371, 381, 393 P.3d 836 (2017), cases in which involved the owners directly not providing food or water to their animals. Jallow ignores that as the owner of the animals, he was still responsible for their care in his absence. Although Jallow himself was not neglecting to feed and water the animals, he was directly responsible for not ensuring that his animals were properly cared for. Because any rational trier of fact could have found that Jallow acted with criminal negligence, sufficient evidence supported his conviction.

B. To-Convict Instruction

Jallow next argues that he was denied due process because the to-convict instruction for animal cruelty omitted an essential causation element: "as a result causes" the animal to suffer or die. We agree.

This court reviews to-convict jury instructions de novo. State v. Fisher, 165 Wn.2d 727, 754, 202 P.3d 937 (2009). A jury instruction is sufficient if it correctly states the law, is not misleading, and permits counsel to argue their theory of the case. State v. Mark, 94 Wn.2d 520, 526, 618 P.2d 73 (1980). The jury instructions must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt. State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). A to-convict instruction must contain all of the essential elements of the crime because it serves as "yardstick" for the jury to measure innocence or guilt. State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). Failure to instruct the jury on all essential elements relieves the State of its burden of proving every element of the crime beyond a reasonable doubt. In re Pers. Restraint of Caldellis, 187 Wn.2d 127, 136,

385 P.3d 135 (2016). "This is reversible error unless the court is convinced, beyond a reasonable doubt, that the error did not contribute to the verdict." Caldellis, 187 Wn.2d at 136.[3]

There is no pattern jury instruction for the crime of animal cruelty. As a result, trial courts should use the language of the statute, where the law governing the case is expressed in the statute, when instructing the jury. State v. Hardwick, 74 Wn.2d 828, 830, 447 P.2d 80 (1968). RCW 16.52.205(2) provides:

> A person is guilty of animal cruelty in the first degree when . . . he or she, with criminal negligence, starves, dehydrates, or suffocates an animal, or exposes an animal to excessive heat or cold and as a result causes: (i) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (ii) death.

(Emphasis added).

"Elements of a crime are the constituent parts of a crime, usually consisting of conduct, knowledge, and causation." Caldellis, 187 Wn.2d at 136 (citing Fisher, 165 Wn.2d at 754). Washington case law recognizes the statutory elements of a crime as essential elements. Fisher, 165 Wn.2d at 754. In St. Clare, we recognized four essential elements for the crime of first degree animal cruelty: (1) the specific act that must be proven, (2) the state of mind, (3) the result of the act on the animals, and (4) the location. 198 Wn. App. at 377. While St. Clare examined the mental state required for first degree cruelty to animals, this court still held that a to-convict instruction

---

[3] Error with a jury instruction may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. State v. Salas, 127 Wn.2d 173, 182, 897 P.2d 1246 (1995). The omission of an element from the to-convict instruction is of "sufficient constitutional magnitude to warrant review when raised for the first time on appeal." State v. Mills, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). "It cannot be said that a defendant has had a fair trial if the jury must guess at the meaning of an essential element of a crime or if the jury might assume that an essential element need not be proved." Smith, 131 Wn.2d at 263.

included each statutory element when the language "as a result," was in the instruction, thus linking the defendant's negligence to the result of the animal's suffering. St. Clare, 198 Wn. App. at 378.

For Jallow, the court instructed the jury:

> To convict the defendant of the crime of First Degree Animal Cruelty as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 19th day of October, 2016, through on or about the 9th day of December, 2016 the defendant acted with criminal negligence in starving or dehydrating an animal, to wit: a small brown sheep;
> (2) the animal suffered substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering, or death;
> (3) That the defendant was not authorized by law to commit this act; and
> (4) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty. [4]

Jallow argues that the instruction omits the language "as a result causes," which is an essential, causation element of the crime. We agree. The instruction given in Jallow's case lacked the causation element of the crime because it omitted the language "as a result." Without this language, the jury was not properly instructed to convict Jallow only if the sheep suffered substantial and unjustifiable physical pain as a result of Jallow's criminal negligence. Under the instruction as given, Jallow was unable

---

[4] The instruction for count 3 of animal cruelty is identical, except that it refers to a "tan female sheep."

to argue his theory of the case—that it was Jabang's criminal negligence, not Jallow's criminal negligence, which resulted in the suffering of the animals. The omission of the causation element is significant because it is at least reasonably debatable whether Jabang's negligence was a superseding cause of the sheep's suffering. Because the to-convict instruction lacked the statutory language outlining the essential element of causation, the instruction was insufficient.

"When applied to an element omitted from, or misstated in, a jury instruction, the error is harmless if that element is supported by uncontroverted evidence." State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 88 (2002). To hold any error harmless, we need to conclude that the jury verdict would be the same absent any error. Brown, 147 Wn.2d at 341. Because the evidence presented at trial provided a reasonable basis that it was Jabang's actions, and not Jallow's criminal negligence, which resulted in the suffering of the animals, the error is not harmless. A reasonable juror could have found that Jallow's negligence did not result in the substantial and unjustifiable physical pain of either sheep, yet still could have convicted Jallow under the instruction given. For these reasons, the error was not harmless and the incomplete to-convict instruction requires reversal.

C. Unanimous Jury Verdict

Jallow also contends that first degree animal cruelty is an alternative means crime and because there was no particularized expression of jury unanimity on each of the alternative means reversal of one of the animal cruelty convictions is required. Although we reverse based on the instructional error, the State makes a compelling argument asking us to hold that RCW 16.52.205(2) is not an alternative means crime.

-11-

We agree with the State, and hold that RCW 16.52.205(2) is not an alternative means crime.

Criminal defendants in Washington are entitled to a unanimous jury verdict. State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). If "the crime charged can be committed by more than one means, the defendant does not have a right to a unanimous jury determination as to the alleged means used to carry out the charged crime or crimes should the jury be instructed on more than one of those means." State v. Smith, 159 Wn.2d 778, 783, 154 P.3d 873 (2007). But in order to safeguard the defendant's right to unanimity, "substantial evidence of each of the relied-on alternative means must be presented." Smith, 159 Wn.2d at 783. However, when the instruction involves alternatives that are characterized as a "means within a means," the alternative means doctrine does not apply. Smith, 159 Wn.2d at 783.

Alternative means crimes provide that the proscribed criminal conduct may be established by a variety of distinct acts, each which amounts to the same crime. Smith, 159 Wn.2d at 784. Typically, "such crimes are set forth in a statute stating a single offense, under which are set forth more than one means by which the offense may be committed." Smith, 159 Wn.2d at 784. In Smith, for example, our Supreme Court recognized that the second degree criminal assault statute articulated a single criminal offense but then provided six separate subsections by which the offense could be committed. RCW 9A.36.011-.031. The court concluded that each of the six subsections represented an alternative means of committing the crime of second degree assault. Smith, 159 Wn.2d at 784. The court declined, however, to hold that the common law definitions of assault used in the definition instruction also constituted

alternative means requiring substantial evidence to support each alternative definition. Smith, 159 Wn.2d at 786-787. Instead, the court concluded that the various common law definitions of assault "merely define an element of the crime charged and, thereby, give rise to a 'means within a means' scenario" that did not trigger jury unanimity protections. Smith, 159 Wn.2d at 787.

Jallow contends that first degree animal cruelty under RCW 16.52.205(2) is an alternative means crime that may be committed by the alternative means of starvation, dehydration, or suffocation. Jallow bases his argument on our decisions in Peterson and St. Clare. The State encourages us to reexamine St. Clare and Peterson and hold that first degree animal cruelty is not an alternative means crime. We agree with the State.

In Peterson, the defendant was convicted of six counts of animal cruelty in the first degree for starving and dehydrating horses. Peterson, 174 Wn. App. at 844. While rejecting the defendant's argument that substantial evidence did not show that the horses were suffering from dehydration, this court held that under RCW 16.52.205(2), "starvation, dehydration, and suffocation are different ways of committing the crime of animal cruelty in the first degree and are not merely descriptive or definitional but, rather, separate and essential terms of the offense." Peterson, 174 Wn. App. at 851.

In St. Clare, the defendant, who was charged with 10 counts of animal cruelty toward cats, argued that the evidence was insufficient to one of the alternative means— either starvation or dehydration. St. Clare, 198 Wn. App. at 379. This court rejected this argument, and concluded that "regardless of whether RCW 16.52.205(2)

establishes starvation and dehydration as alternative means, the evidence was sufficient to support St. Clare's conviction." St. Clare, 198 Wn. App. at 381-82.

The concurrence in St. Clare explained that both Peterson and the majority's reliance on Peterson was erroneous because it confused means within a means for actual alternative means. St. Clare, 198 Wn. App. at 386 (Dwyer, J., concurring). As the concurrence explained:

> The alternative means of committing the crime of animal cruelty in the first degree are three in number. They are set out in subsections 1, 2, and 3 of former RCW 16.52.205. Each of these subsections begins with the words, "A person is guilty of animal cruelty in the first degree when . . ." In each subsection, thereafter follows the words describing the means set forth therein.
>
> The error made in Peterson is that the court confused certain subalternatives ("means within a means") for actual alternative means. The words set forth in subsection 2 ("starves, dehydrates, or suffocates") are "means within a means." The jury unanimity guarantee does not attach to these subalternatives.
>
> Subsection 1, viewed broadly, criminalizes torturing animals. Subsection 2, viewed broadly, criminalizes withholding life's necessities (air, food, water) from animals. Subsection 3 criminalizes sexual perversion with animals. These are the alternative means.
>
> This court, in Peterson, got it wrong. The majority opinion perpetuates the error.

St. Clare, 198 Wn. App. at 385-86.

We agree with the concurrence in St. Clare that Peterson was wrongly decided. We now hold that the alternative means doctrine does not apply to animal cruelty in the first degree. RCW 16.52.205 includes three subsections with alternative means of committing animal cruelty in the first degree. As in Smith, each subsection contains a means within a means of accomplishing the crime. RCW 16.52.205(2) provides an

-14-

alternative means of committing animal cruelty: depriving the animal of the necessities of life. The "means within the means" of depriving the animal of necessities of life are starving, dehydrating, suffocating, or exposing the animal to excessive heat or cold.

Reversed.

_Mann, C.J._

WE CONCUR:

_____         _Andrus, A.C.J._